GLICKSTEIN, Judge,
concurring specially.
In Canakaris v. Canakaris, 382 So.2d 1197, 1201-02 (Fla.1980), the court set forth the criteria to be used in establishing the need of one spouse for permanent periodic alimony and the ability of the other to provide it. These include:
1.The parties’ earning ability, age, health and education.
2. The duration of the parties’ marriage.
3. The parties’ standard of living during the marriage.
4. The value of the parties’ estates.
Affirmance is appropriate here in light of the above criteria and the trial judge’s discretionary power. The trial court’s findings include the following:
The parties were married on October 8, 1963 in Marshall, Illinois when the Wife was nineteen and the Husband was twenty-one while both were students at Ohio State University. Upon marriage, the Wife discontinued her education to work to support the Husband in his education. As a result of the efforts of both the Husband and Wife, the Husband obtained a degree in Aeronautical Engineering. During the course of this twenty-four plus year marriage, the parties have had four children. The youngest turned eighteen November 24, 1987. Kelly Anne still resides in the family home as does one of the parties’ other children who is recuperating from drug dependency. Throughout the course of the marriage, the Wife has been a dutiful helpmate and homemaker while the husband has been a good provider and father. Both parties are in good health. The Husband is employed as an engineer with Pratt and Whitney Aircraft where he is presently earning approximately $64,380.00 a year. The wife has obtained a real estate broker-associate license and has in the past eight years been in real estate sales. She earned approximately $34,000.00 working full time in 1985 and for the first ten months of 1987 while working part-time earned approximately $18,300.00. The Wife also has in the past qualified as and has been engaged as a mortgage broker.
(Emphasis added.) The trial court then itemized the values of the parties’ respective estates, and evened them up by means of lump sum alimony. The wife was awarded permanent periodic alimony of $2,100 per month.
The emphasized portion of the trial court’s findings points out a common expe *1185 rience; namely, the wife’s hitching her wagon to the husband’s economic star while giving up her own career aspirations in order to be the homemaker, only to find — in middle age — that the star has become unhitched.
Professor Joan M. Krauskopf, in her article, Rehabilitative Alimony; Uses and Abuses of Limited Duration Alimony, 21 Family Law Quarterly 573 (1988), writes apropos this pandemic situation:
1. PURPOSES FOR INDEFINITE ALIMONY
Although no consensus has been reached concerning the purposes served by modern indefinite alimony or maintenance, there is a remarkably high consistency among goals sometimes stated and the factors often considered relevant to making the alimony decision. Those same goals and factors are consistently mentioned in recent cases challenging limited alimony.
The two most often-expressed purposes are:
1. To compensate for benefits conferred on the other spouse by being responsible for homemaking and child rearing. The primary benefit is increased earning capacity of the other spouse who, while enjoying family life, was free to devote all productive time to income production.
2. To compensate for the opportunity costs of homemaking. This is primarily lost earning capacity through years of major responsibility for the home, either not being employed or holding employment subject to the needs of the family. Courts recognize this opportunity cost when they refer to the fact that the claimant for alimony had remained in the home in the traditional role of full-time homemaker. There is, also, a cost in lessened opportunity for remarriage which is greater for women than men and which increases the longer the marriage lasts.
In short, “a transfer of earning power” occurs during a traditional marriage in which the homemaker spouse’s efforts increased the other’s earning capacity at the expense of her own. Alimony is an award formulated to compensate for that transfer by sufficiently (fairly) meeting reasonable needs for support not otherwise met by property division and personal income.
2. PRIMARY STANDARD FOR DETERMINING REASONABLE NEEDS AND AMOUNT OF ALIMONY-STANDARD OF LIVING OF THE MARRIAGE RELATIVE TO MARRIAGE DURATION
Certainly, the modern alimony accompanying no-fault dissolution contemplates that a former homemaker will do all that is reasonable to obtain employment and contribute to her support. Factors such as age, health, education, and employment history are relevant to deciding her earning ability.
However, we are concerned with the remaining gap between income the homemaker is capable of producing and the amount claimed as necessary living expenses. Most courts use a concept of reasonable needs to determine the amount of the gap which the other spouse, who is able to pay, will be ordered to pay.
[[Image here]]
By what standard is the court guided in the process? In most states, the remaining statutory or judicially formulated factors relevant to alimony determinations guide the court. The court considers those other factors to arrive at both reasonable needs and amount of alimony which it seems fair to transfer between the ex-spouses. The two most influential factors in determining reasonable needs are standard of living of the marriage and duration of the marriage. The primary standard for determining reasonable needs and amount of periodic alimony is standard of living of the marriage relative to the duration of the marriage. Even those opinions most vociferously explaining that the new alimony is different in requiring the recipient to utilize her fullest earning ability state that the marriage standard and duration of the marriage remain important factors. The combination of marriage standard of liv *1186 ing and duration of marriage is directly relevant to deciding what extent of the expense-income gap should be filled by payment of alimony. All of the following reasons apply.
1. The longer the marriage, the more both parties have contributed to that jointly maintained standard of living.
2. The longer the marriage, the more both parties have set that standard of living as their own measure of reasonable needs.
3. The longer the marriage, the more homemaker’s earning capacity decreases, making either that earning capacity or mere employability unrealistic as a measure of reasonable needs.
4. The longer the marriage, the more homemaker’s full responsibility for the home decreased the homemaker’s earning capacity and simultaneously benefited the other spouse by allowing him to have a family and yet devote all productive hours to increasing his earning capacity.
Id. at 583-86 (footnotes omitted).